UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TOYA HALLMON, | ) | |
| | ) | |
| Plaintiff, | ) | 11 C 1297 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| SCHOOL DISTRICT 89, COOK COUNTY, IL, and | ) | |
| SUSAN FLANAGAN, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>Memorandum Opinion and Order</u>

Toya Hallmon, a former public school substitute teacher, brought this suit against

Defendants School District 89 and Susan Flanagan, the District's interim superintendent,

alleging that they: (1) discriminated against her on the basis of race (she is African-American);

(2) subjected her to a racially hostile work environment; and (3) terminated her in retaliation for

complaining of race discrimination, all in violation of 42 U.S.C. §§ 1981 and 1983 and Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The court dismissed the Title VII

claims as time-barred. Doc. 36. Defendants have moved for summary judgment on the §§ 1981

and 1983 claims. Doc. 49. The motion is granted as to the race discrimination claim and denied

as to the hostile work environment and retaliation claims.

### Background

Hallmon began working for the District as a substitute teacher in 2004 or 2005. Doc. 55

at ¶ 5. Flanagan, who is white, has held several managerial positions with the District and

became its Interim School Superintendent in Spring 2010. *Id.* at ¶ 10; Doc. 59 at p. 24, ¶ 1. In

August or September 2010, Flanagan informed Hallmon that she was being fired. Doc. 59 at

p. 30, ¶ 21.  During the course of her employment, Hallmon was involved in several incidents with various District employees.  The parties dispute the facts of most of the incidents; because Hallmon is the non-movant, the facts will be stated as favorably to her as the record and Local Rule 56.1 allow.  *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012).

In 2005, Hallmon was assaulted by students at one of the District's schools.  Doc. 55 at ¶ 36; Doc. 59 at p. 25, ¶ 4.  Hallmon reported the assault to Flanagan, who told Hallmon that she should write a report of the incident for the District, but that if she wanted the police involved, she should go to the police station and file a report herself.  Doc. 59 at p. 25, ¶ 4.  By contrast, the police were called to the school after an earlier incident in which a white teacher was assaulted; the evidence does not reveal if Flanagan was involved—Hallmon uses the passive phrase "the police were called" rather than saying who called them, *ibid.*—or if the two incidents were otherwise similar.  Doc. 55 at ¶ 37.  Hallmon concedes that she does not know who called the police in response to the earlier incident.  *Ibid.*  However, Hallmon was told by a District employee that the District's policy in such situations was to call Flanagan for instructions; this suggests to Hallmon that Flanagan would have been involved in the decision to call the police after the assault on the white teacher.  *Id.* at ¶ 38.

During her employment with the District, Hallmon heard teachers at the District's "white schools" use the word "nigger" in teachers' lounges and in classrooms.  Doc. 59 at pp. 27-28, ¶ 9.  "White schools" is the parties' term for schools that have predominantly white student bodies.  Doc. 55 at ¶ 24.  The parties do not indicate whether the "white schools" had predominantly white permanent teachers.  They do agree that over three-quarters of the District's substitute teachers were African-American, and Hallmon stated that she had never seen a

substitute teacher who was not African-American, even at the "white schools." *Id*. at ¶¶ 14, 18. Hallmon rarely taught at the "white schools." *Id*. at ¶ 25.

With the exceptions described below, Hallmon does not maintain that anyone ever used the term "nigger" to refer to her or in conversation with her. *Id*. at ¶ 26. Hallmon does say that teachers at the "white schools" did not respect, support, or acknowledge her, causing her to feel like an outcast. *Id*. at ¶ 17. The white teachers gave her the cold shoulder, closed their doors and did not answer when she knocked, and made her feel isolated at lunchtime. *Id*. at ¶ 20. Another African-American substitute teacher, Odessa Wynn, had similar complaints. *Id*. at ¶ 29.

In February 2006, Stacy Annis, a fourth-grade teacher at Lincoln School, one of the schools where Hallmon worked as a substitute teacher, called Hallmon a "dumb nigger." *Id*. at ¶ 13; Doc. 59 at p. 25, ¶ 5. (It is appropriate at this juncture to reiterate that the facts on summary judgment must be recited in the light most favorable to the non-movant, Hallmon; by reciting those facts, the court does not endorse them.) Following the incident, Hallmon went to the next two classrooms to which she was assigned and finished her three substitute teaching assignments for the day. Doc. 55 at ¶ 46. Hallmon reported the incident to Lincoln's assistant principal, Sharece Rouse-Spivey, who like Hallmon is African-American. *Id*. at ¶ 11; Doc. 59 at pp. 25-26, ¶ 6. (District policy provides that complaints of discrimination can be made to any administrator, principal, or vice principal. Doc. 59 at p. 25, ¶ 3.) Spivey told Hallmon that she did not believe that Annis had used the term "nigger" and that Hallmon should submit a written report of the incident. *Id*. at pp. 25-26, ¶ 6. Hallmon submitted to Spivey a report that accused Annis of using that term, and Spivey told Hallmon to write a new report that did not make that accusation. *Ibid*. District policy called for Spivey to report complaints of race discrimination or harassment, yet she did not investigate Hallmon's complaint or report it to anyone. *Id*. at p. 26,

¶ 7.  Hallmon also claims that Annis "physically accosted" her during the 2006 incident, though she does not explain what she means by the quoted phrase and does not say whether she reported the physical nature of the incident to anyone.  *Id*. at p. 28, ¶ 14.  Annis had her own complaints about Hallmon's behavior; like Hallmon, Annis was told to submit a written report.  Doc. 55 at ¶ 50.

Hallmon also reported the incident with Annis to Karen Pettis, who was principal of another of the District's schools, Emerson School.  Doc. 59 at p. 26, ¶ 8.  Hallmon told Pettis as well that she had been harassed while substitute teaching at the "white schools."  *Ibid*.  Rather than taking action on the complaints, Pettis suggested that Hallmon work at Emerson, which had a predominantly African-American student body.  *Ibid*.; Doc. 56-1 at 20.  On the basis of Pettis's advice, Hallmon asked to be placed at Emerson.  Doc. 59 at pp. 28-29, ¶ 15.

Hallmon taught summer school in 2009, having been recommended for that job after receiving a "teacher of the year" award.  *Id*. at p. 30, ¶ 19.  The parties do not say who gives those awards, how many are given out, or what their significance is, and nor do they discuss the significance of being recommended to teach summer school.

In August or October 2009, Hallmon and Flanagan attended a substitute teacher workshop.  Doc. 55 at ¶ 15; Doc. 59 at p. 27, ¶ 10.  Hallmon expressed concern about the treatment of substitutes in the District's schools, saying that they were not respected, had been subjected to a pay cut, were not told their duties, and had not received the same help that permanent white teachers receive.  Doc. 55 at ¶ 15; Doc. 59 at p. 27, ¶ 10.  Flanagan was aware of Hallmon's complaints.  Doc. 59 at p. 27, ¶ 11.

In October 2009, Hallmon was written up for allegedly behaving unprofessionally in front of her kindergarten students and for refusing to follow the lesson plan that she had been

assigned to teach. Doc. 55 at ¶¶ 51-52. Hallmon denies those charges, and a reasonable jury could believe her, so the court will disregard the merits of the charges themselves. However, Hallmon does not dispute that Flanagan believed the report that Hallmon had acted inappropriately and that this was one of the reasons Flanagan gave for firing Hallmon.

In January 2010, Hallmon had another run-in with Annis while substitute teaching at Lincoln School. *Id*. at ¶ 54. Annis told Hallmon that there would be a pizza party for the students later that day and that Hallmon should bring her class; Hallmon responded that the party was not in the substitute plans that she had received. *Id*. at ¶ 55. Hallmon brought her students to the party late and was stopped by Annis when attempting to leave the cafeteria. *Id*. at ¶ 56. Annis called Hallmon "nigger," "monkey," "ape," and "baboon." Doc. 59 at pp. 27-28, ¶ 12. Hallmon complained to Lincoln's assistant principal, Kathryn Hayes, and to Flanagan, Pettis, and a member of the District's board, but they took no action. *Id*. at pp. 27-28, ¶¶ 12-13. Hallmon also reported the incident to Flanagan, adding that race-based workplace harassment is against the law. *Id*. at p. 29, ¶ 16.

On the same day in January 2010, Annis encountered a student with a disability crying in the hallway. Doc. 55 at ¶ 59. The student told Annis that Hallmon had yelled at her. *Id*. at ¶ 60. Upset that Hallmon had (according to the student) caused the child to cry, Annis told the principal, who decided that she no longer wanted Hallmon to substitute teach at Lincoln. *Id*. at ¶ 62. Hallmon denies that she yelled at the child, and the court will assume that she did not, but Hallmon does not deny that the child told Annis that Hallmon had yelled at her or that Annis and the principal credited the child's report. *Id*. at ¶ 60. Also in January 2010, Hallmon was physically accosted by a teacher named Blau, who put her hand in Hallmon's face and made her feel threatened. Doc. 59 at p. 28, ¶ 14.

At a meeting between Flanagan and Hallmon in January 2010, Flanagan sided with the white teachers and principals who had complained of Hallmon's behavior and against Hallmon, who had complained about the recent incident with Annis. Doc. 55 at ¶ 53. Hallmon does not suggest that Flanagan did not honestly believe the other teachers' and principals' accounts or that Flanagan had an improper or discriminatory motive in believing their accounts.

In February 2010, Hallmon became the subject of an investigation by the Illinois Department of Children and Family Services ("DCFS") after a student reported to a principal that Hallmon had beat him up, kicked him, slapped him, and thrown him against a wall. *Id.* at ¶ 63; Doc. 59 at p. 29, ¶ 17. Hallmon maintained that she was innocent, and in June 2010 DCFS dropped the charge and cleared Hallmon of wrongdoing. Doc. 59 at p. 29, ¶¶ 17-18. Hallmon contacted Flanagan and told her that the charge had been dropped, but Flanagan said that she had not received notification from DCFS and needed to wait until that occurred. *Id.* at p. 29, ¶ 18. Hallmon did not teach summer school in 2010, *id.* at p. 30, ¶ 19, though the parties do not say why or explain why this fact is material.

During her time as a substitute teacher, Hallmon made negative impressions on several school administrators. Pettis, the principal of Emerson School, provided a letter of recommendation for Hallmon because other administrators had expressed concern with her performance. Doc. 55 at ¶¶ 8, 67. But Pettis herself had concerns about Hallmon's performance and classroom management, and she once told Hallmon to "tone it down" because Hallmon was loud and excitable. *Id.* at ¶¶ 66, 68. Spivey, the assistant principal at Lincoln School, requested that Hallmon not be assigned to substitute teach at Lincoln—something Spivey has had little experience doing with other substitute teachers. *Id.* at ¶¶ 11, 72, 74. Although administrators had requested that other substitute teachers not be assigned to their schools at various times, the

parties agree that "each situation was different and none were similar to [Hallmon's] circumstances." *Id*. at ¶ 79. Neither party describes any other substitute teacher fired by the District or the circumstances of any such termination.

As mentioned above, in August or September 2010, Flanagan informed Hallmon that she was being fired. Doc. 59 at p. 30, ¶ 21. At her deposition, Flanagan testified that her personal policy is to give substitute teachers three chances before termination, and she explained that she considered Hallmon's three strikes to have been the October 2009 incident in which Hallmon was written up for allegedly behaving unprofessionally in front of her kindergarten class, the January 2010 incident in which a student reported that Hallmon had yelled at her and made her cry, and the February 2010 incident that led to the DCFS investigation. *Id*. at p. 30, ¶ 22. Flanagan explained that she waited to fire Hallmon until August or September rather than immediately after the February 2010 incident because she wanted to await the results of the DCFS investigation (which, as noted, ended up clearing Hallmon). *Id*. at pp. 30-31, ¶¶ 23-26. Prior to Hallmon's termination, there was no official process in place for firing substitute teachers. Doc. 55 at ¶ 80.

## Discussion

## I.     Race Discrimination

In her brief opposing summary judgment, Hallmon argues that she suffered three specific episodes of race discrimination: (1) in 2005, when Flanagan refused to call the police to the school after Hallmon was assaulted by students; (2) in and after August or October 2009, when Flanagan failed to take steps to rectify the unfavorable treatment of substitute teachers at the "white schools" in the wake of Hallmon's public complaints at the August or October 2009 substitute teacher workshop; and (3) in January 2010, when Flanagan sided with the principals

and white teachers and against Hallmon regarding complaints made about Hallmon and Hallmon's complaint about Annis.  Doc. 57 at 3-4.  Hallmon's brief does *not* contend that her termination resulted from race discrimination.  Because Defendants' initial summary judgment brief maintained that the record evidence foreclosed any race discrimination claim arising from the termination, Hallmon's failure to address her termination in the race discrimination section of her brief forfeits any such claim.  *See Domka v. Portage Cnty., Wis.*, 523 F.3d 776, 783 (7th Cir. 2008) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered."); *Witte v. Wis. Dep't of Corr.*, 434 F.3d 1031, 1038 (7th Cir. 2006) ("By failing to raise [an argument] in his brief opposing summary judgment, [the plaintiff] lost the opportunity to urge it in both the district court and this court."); *Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) ("because [the plaintiff] failed to delineate his negligence claim in his district court brief in opposition to summary judgment … his negligence claim is deemed abandoned") (internal quotation marks omitted); *Beard v. Don McCue Chevrolet, Inc.*, 2012 WL 2930121, at *7 (N.D. Ill. July 18, 2012) (holding that forfeiture applied where the plaintiff "d[id] not cite or discuss any failure-to-promote cases whatsoever in the section of his brief devoted to his failure-to-promote discrimination claim").  Hallmon's termination will be addressed below in Section III, which considers her retaliation claim.

Because employment-related race discrimination claims under §§ 1981 and 1983 are analyzed under the framework governing Title VII claims, the court will rely on Title VII precedents in discussing Hallmon's race discrimination claim.  *See Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir. 2010).  To proceed with a race discrimination claim, Hallmon must show that she suffered a "materially adverse employment action."  *Dass v.*

*Chi. Bd. of Educ.*, 675 F.3d 1060, 1068-69 & n.9 (7th Cir. 2012); *see also de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 685 (7th Cir. 2008). "A materially adverse employment action is something more disruptive than a mere inconvenience or an alteration of job responsibilities. While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (citations and internal quotation marks omitted). The Seventh Circuit has classified materially adverse employment actions into three categories:

> (1) cases in which the employee's compensation, benefits or other financial terms of employment are diminished, including cases where employment is terminated; (2) cases in which a nominally lateral transfer without a change in financial terms significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced; and (3) [c]ases in which the employee is not moved to a different job or the skill requirements of his present job altered, but the conditions in which he works are changed in a way that subjects him to humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment—an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet.

*Tart v. Ill. Power Co.*, 366 F.3d 461, 475 (7th Cir. 2004) (alteration in original) (internal quotation marks omitted). Hallmon's discrimination claim fails because none of the three incidents underlying the claim qualifies as a materially adverse employment action.

The 2005 episode in which Flanagan refused to call the police after Hallmon suffered an assault was not a materially adverse employment action. Hallmon does not explain what she wanted the police to do at the school; she does not suggest either that she continued to feel threatened by the students at the time she spoke with Flanagan or that she thought the students

should be arrested. Even if Hallmon did need to speak to the police about the incident, Flanagan did not try to prevent her from doing so; to the contrary, Flanagan told Hallmon that if she wanted to involve the police, she should go to the station and file a police report. Telling an employee who desires police action to file a report herself is not a materially adverse employment action, at least absent an ongoing concern for the employee's safety. A jury could not find on this record that Flanagan's refusal to call the police subjected Hallmon to a "humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [her] workplace environment," *Tart*, 366 F.3d at 475, or that it directly or indirectly affected her compensation or prospects for promotion. Without more, an employer's refusal to take an action that an employee wants it to take is not a materially adverse employment action. *See Dass*, 675 F.3d at 1069-70 (holding that assigning a teacher to teach seventh grade when she preferred to teach third grade is not an adverse employment action); *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 730 (7th Cir. 2009) ("if personal preference alone was sufficient to establish adverse employment action, the objective requirement for such a finding would effectively be eliminated and federal employment law would become a mechanism for enforcing employee preferences rather than remedying materially adverse treatment"); *de la Rama*, 541 F.3d at 686 ("An employee's unhappiness with her employer's conduct or decision is insufficient to support a claim under Title VII.").

Nor did Hallmon suffer a materially adverse employment action when Flanagan took no action on Hallmon's complaints at the August or October 2009 substitute teacher workshop that white permanent teachers at the "white schools" gave Hallmon the "cold shoulder," ignored her when she asked them questions, and made her feel isolated in the teachers' lunchroom. Hallmon does not and could not plausibly maintain that the permanent teachers' unkind treatment of her

diminished her chances for career advancement, or that it was "a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [her] workplace environment—an alteration that can fairly be characterized as objectively creating a hardship." *Tart*, 366 F.3d at 475. Rather, the alleged mistreatment falls within the rule that "not everything that makes an employee unhappy is an actionable adverse action." *Nichols*, 510 F.3d at 780. The permanent teachers' cold treatment of Hallmon was not itself a materially adverse employment action. *See Scheer v. Motorola, Inc.*, 2010 WL 1878265, at *16 (E.D. Pa. May 10, 2010) ("Evidence that Scheer was shunned at work is, likewise, insufficient to convince a reasonable jury of an adverse employment action."). It necessarily follows that Flanagan's alleged failure to take action to make the permanent teachers behave more kindly to Hallmon was not a materially adverse action either. *See Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000) ("Because an employer cannot force employees to socialize with one another, ostracism suffered at the hands of coworkers cannot constitute an adverse employment action.").

Finally, it was not a materially adverse employment action for Flanagan to "side" with the principals and white teachers at the January 2010 meeting with Hallmon. Taking the side of one employee over another does not fit within any of the three categories of materially adverse actions, and it is not of comparable severity. *See Vance v. Ball State Univ.*, 646 F.3d 461, 475 (7th Cir. 2011) ("No reasonable jury could find that the delivery of a verbal warning, based on a complaint from a coworker, constitutes an adverse employment action or creates an objectively hostile work environment."); *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010) ("unfair reprimands or negative performance evaluations, unaccompanied by some *tangible* job consequence, do not constitute adverse employment actions") (internal quotation marks omitted); *de la Rama*, 541 F.3d at 686 (same). A supervisor's or employer's siding against an

employee, with nothing more, does not rise to the level of a materially adverse employment action. *See Thomas v. La. Dep't of Soc. Servs.*, 406 F. App'x 890, 897 (5th Cir. 2010) ("Thomas [the plaintiff] did allege that Rehage [the office administrator] sided against her in a dispute with white co-workers. However, Thomas does not claim that she suffered an adverse employment action as a result of this dispute."); *Stronach v. Va. State Univ.*, 631 F. Supp. 2d 743, 751 (E.D. Va. 2008) (holding that a university's siding with a student against a professor in a grading dispute "may have been embarrassing or even infuriating for [the professor], but … it did not alter the conditions of his employment"); *Beverley v. 1115 Health & Benefit Fund*, 420 F. Supp. 2d 47, 58 (E.D.N.Y. 2005) (the fact that the plaintiff's manager "sided with" the plaintiff's co-worker in a dispute with the plaintiff "d[id] not rise to the level of an 'adverse employment action'").

Because there was no materially adverse employment action, Hallmon's race discrimination claim would fail even if the evidence would permit a reasonable jury to find that any of the three incidents was motivated by racial animus. That said, Hallmon cannot establish that aspect of her claim under either the direct or the indirect method. *See Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (a race discrimination plaintiff may seek to prevent summary judgment under either the direct method or the indirect method); *Rodgers v. White*, 657 F.3d 511, 516-17 (7th Cir. 2011) (same). The section of Hallmon's brief devoted to her discrimination claim does not refer to either method. Doc. 57 at 3-4. For the sake of completeness, the court will address both methods.

"Under the 'direct method,' the plaintiff may avoid summary judgment by presenting sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Coleman*, 667 F.3d at 845. "Direct evidence is

evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption.  In short, direct evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citations and internal quotation marks omitted); *see also Coleman*, 667 F.3d at 860; *Everett v. Cook Cnty.*, 655 F.3d 723, 729 (7th Cir. 2011).  "A plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker.  That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action." *Rhodes*, 359 F.3d at 504 (citations and internal quotation marks omitted); *see also Everett*, 655 F.3d at 729 (explaining that circumstantial evidence is "evidence that points to discriminatory animus through a longer chain of inferences").  Circumstantial evidence typically falls into one of three categories: "(1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011); *see also Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011).  The appropriate focus under the direct method "is not whether the evidence offered is direct or circumstantial but rather whether the evidence points directly to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (internal quotation marks omitted); *see also Everett*, 655 F.3d at 729; *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 672 (7th Cir. 2011).

With respect to the first episode of alleged discrimination, Hallmon suggests that discriminatory intent is evident from the mere fact that the police had been called to the school in response to the assault on a white teacher but not in response to the assault on her. Assuming that Flanagan authorized calling the police in response to the assault on the white teacher—though Hallmon concedes that she does not know whether Flanagan made that decision, Doc. 55 at ¶ 37—the evidence does not support the inference that the only material difference between the two instances was the race of the assaulted teacher. "Assault" covers a very broad range of behavior, and can mean anything from a serious physical attack to a gesture that merely threatens physical attacks but that does not entail physical contact. *See, e.g.*, *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 659 (7th Cir. 2012) ("On June 25, 2004, another inmate assaulted Rice in his cell by poking him in the groin with a broomstick through the bars of his cell door. Rather than move in order to avoid the broomstick, Rice simply stood in place, catatonic, while he was assaulted. The attack left visible welts on his back, buttocks, and side."); *Zheng v. Holder*, 666 F.3d 1064, 1065 (7th Cir. 2012) ("Zheng happened to be visiting the cousin when the officers arrived, and she forcibly resisted their effort to seize the cousin. The officers responded by kicking, beating, and cursing her. She was bruised, and to an undetermined extent bloodied. The family planning officers called the police, who came and arrested her, and she was in jail for three days and while there was beaten twice. Apparently she didn't seek medical attention for any injuries inflicted by the assaults, but we do not know whether it would have been feasible for her to do so; we are not informed about the conditions and availability of medical care for persons in her situation in Fujian Province."); *Jones v. Cross*, 637 F.3d 841, 848 (7th Cir. 2011) ("At common law, assault involved no physical contact (only the threat of such contact), whereas battery did require such contact."); *United States v.*

*Robinson*, 537 F.3d 798, 803 (7th Cir. 2008) ("Although attempting to shoot (or pistol-whip or otherwise harm) the officers would be a felony attempted aggravated battery, attempting to point or brandish the gun would only be a misdemeanor attempted aggravated assault under Illinois law."); *Yang v. Hardin*, 37 F.3d 282, 286 (7th Cir. 1994) ("assault" under Illinois law means "an intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented"). It is not reasonable to infer that the assault on Hallmon was as severe as the assault on the white teacher simply because the term "assault" can be used to describe them both. Absent any grounds to believe that the two incidents were similar, no reasonable jury could find that Flanagan had been motivated by discriminatory intent.

Nor has Hallmon adduced evidence from which a jury could infer that the second instance of alleged discrimination, Flanagan's failure to take action on Hallmon's complaints at the August or October 2009 substitute teacher workshop, was motivated by racial animus. In fact, Hallmon does not even argue or present any evidence that Flanagan was motivated by racial bias in failing to act on Hallmon's complaints. Hallmon merely asserts that Flanagan "allowed the [treatment Hallmon complained of] to continue" and "took no action on the issues." Doc. 57 at 3. Although Flanagan's *motivation* in failing to take action is of the utmost importance under the direct method, *see Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011) ("To survive summary judgment under the direct method, Burnell needed to present either direct evidence of discriminatory intent (such as an admission) or enough circumstantial evidence to allow a rational jury to infer that discriminatory intent motivated his firing."); *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 849-50 (7th Cir. 2010) ("To avoid summary judgment

on his gender and race discrimination claims, Egonmwan must either point to enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue (the 'direct' method) or establish a prima facie case under the *McDonnell Douglas* formula (the 'indirect' method)."), Hallmon is silent on the issue. Finally, there is no evidence that Flanagan was motivated by racial bias with respect to the third instance of alleged discrimination, when she credited the reports of numerous teachers and administrators about Hallmon's behavior and performance.

Without evidence of discriminatory intent, Hallmon cannot succeed under the direct method, which leaves the indirect method. Under the indirect method, Hallmon has the initial burden of putting forth a prima facie case of discrimination by offering evidence tending to show that (1) she is a member of a protected class, (2) her performance as a substitute teacher met Defendants' reasonable expectations, (3) she suffered an adverse employment action, and (4) a similarly situated co-worker who is not a member of the protected class was treated more favorably. *See Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 730 (7th Cir. 2011). Hallmon cannot prevail under the indirect method because she has not pointed to a similarly situated, non-African-American comparator.

Hallmon concedes that she never encountered a non-African-American substitute teacher in the District, Doc. 55 at ¶ 18, and her summary judgment papers do not adduce any facts about any such teacher. Nor does Hallmon suggest that any permanent teacher, or any other person, was similarly situated to her. Given that Hallmon has made no attempt to identify a comparator, it is doubtful that she means to pursue the indirect method at all. But even if she does, the attempt is futile because she has adduced no evidence pertinent to the fourth element of her prima facie case. *See Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 590 (7th Cir. 2011)

("Absent a valid comparator, Robles cannot move past summary judgment under the indirect method of proof."); *McGowan v. Deere & Co.*, 581 F.3d 575, 580 (7th Cir. 2009) ("Because [the plaintiff] is unable to demonstrate that a similarly situated person not in the protected class was treated more favorably than he was, he cannot make out a *prima facie* case of racial discrimination.").  And because Hallmon cannot make a prima facie case, there is no need to consider the second step of the indirect method, which asks whether the defendant has "articulate[d] a legitimate, nondiscriminatory reason" for the adverse employment action that, "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action," *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 725 (7th Cir. 2008) (internal quotation marks omitted), or the third step, in which "the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual," *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006).

Hallmon's inability to prevail under either the direct or the indirect method provides a second and independent ground—the first being the absence of a materially adverse employment action—for granting Defendants summary judgment on the race discrimination claim.

## II.     Hostile Work Environment

Hostile work environment claims under § 1981 are analyzed under the framework applied to Title VII hostile work environment claims, so the court will rely on Title VII precedents in discussing Hallmon's § 1981 claim.  *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011).  A court "[should] not find a hostile work environment for mere offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating." *Ibid*.  To survive summary judgment, Hallmon must present evidence sufficient for a reasonable jury to find that: "(1) that her work environment was

both objectively and subjectively offensive; (2) that the harassment was based on her race; (3) that the conduct was either severe or pervasive; and (4) that there is a basis for employer liability." *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011).

Defendants focus on the third element, arguing that the alleged harassment of Hallmon was neither severe nor pervasive. *See Vance*, 646 F.3d at 469 ("We emphasize, as we have before, that the third element of the plaintiff's *prima facie* case is in the disjunctive—the conduct must be *either* severe *or* pervasive."). A court addressing the third element must "look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Russell v. Bd. of Trs. of Univ. of Ill. at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001) (internal quotation marks omitted). Federal employment law does not impose a "general civility code" in the workplace, and "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted).

Hallmon complains of a wide range of conduct by District employees. Some actions, such as the white permanent teachers' refusing to interact with her and causing her to feel isolated, are not severe enough to create or contribute to a hostile work environment. Hallmon also says that she heard the word "nigger" used by unnamed teachers at the "white schools." Doc. 59 at pp. 26-27, ¶ 9. Because Hallmon does not maintain that those teachers used the word in conversation with her or to refer to her—indeed, she provides no information about the contexts in which she heard the unnamed teachers use the word—her allegation's force is diminished by the principle that "[w]hen such harassment is directed at someone other than the

plaintiff, the impact of [such] 'second hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." *McPhaul v. Bd. of Comm'rs of Madison Cnty.*, 226 F.3d 558, 567 (7th Cir. 2000) (internal quotation marks omitted).

Far more significant are the February 2006 and January 2010 incidents in which Annis called Hallmon "nigger" (both times) and "monkey," "ape," and "baboon" (the second time only). Two episodes separated by several years likely do not qualify as "pervasive." *See Saxton v. AT&T Co.*, 10 F.3d 526, 534 (7th Cir. 1993) ("And although there were two instances of sexual misconduct rather than one, it simply did not rise to the level of pervasive harassment as that term has been defined by this court."). The dispositive question, then, is whether those episodes qualify as "severe."

In *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473 (7th Cir. 2004), the Seventh Circuit expressly reserved the question whether being called "nigger" on two occasions qualifies as "severe" for purposes of a hostile work environment claim. Reversing the grant of summary judgment to a defendant, *Hrobowski* held that a reasonable jury could find that a hostile work environment existed where the plaintiff "was repeatedly subjected to hearing the word 'nigger,' including more than one occasion in which a fellow supervisor suggested that he talk to an employee 'nigger to nigger.'" *Id*. at 477. "Given American history," the Seventh Circuit reasoned, "we recognize that the word 'nigger' can have a highly disturbing impact on the listener. Thus, a plaintiff's repeated subjection to hearing that word could lead a reasonable factfinder to conclude that a working environment was objectively hostile." *Ibid*. (citation omitted). The plaintiff in *Hrobowski* was called "nigger" many times, not twice. On that point, the Seventh Circuit observed: "Competent evidence suggests that the word 'nigger' was used frequently, and not just on one or two occasions. We therefore are not faced with the question of

whether infrequent use of that word would allow a reasonable jury to find an objectively hostile environment." *Id*. at 477 n.2.  In the nearly nine years since issuing *Hrobowski*, the Seventh Circuit has not faced a case similar to this one, where the plaintiff twice is called "nigger" to her face.

The post-*Hrobowski* precedent upon which Defendants principally rely, *Ford v. Minteq Shapes & Servs., Inc.*, 587 F.3d 845 (7th Cir. 2009), is inapposite.  *Ford* affirmed summary judgment for the defendants where the plaintiff's co-workers and supervisors referred to him as a "black African-American" or "black man" many times and "gorilla" once, but never called him "nigger."  *Id*. at 846-47.  The distinction between *Ford* and this case can be found in the Seventh Circuit's recognition that "[p]erhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates."  *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).  *Ford* also emphasized that the plaintiff had "failed to adequately pursue his racial harassment complaint" against his primary harasser.  587 F.3d at 848.  By contrast, Hallmon testified that she complained about the first incident with Annis to two administrators, Spivey and Pettis, and that she complained about the second incident to Flanagan, Pettis, and a school board member, none of whom took any action.  Doc. 59 at pp. 25-28, ¶¶ 6-8, 12-13.

Two other post-*Hrobowski* precedents speak more closely to this case.  In *Passananti v. Cook County*, 689 F.3d 655 (7th Cir. 2012), the Seventh Circuit noted that *Rodgers v. Western-Southern Life Ins. Co.*, *supra*, held that a reasonable jury could find a hostile work environment claim where "supervisors and employees referred to [the] plaintiff by the term 'nigger' between

five and ten times during his employment." 689 F.3d at 669. In *Dandy v. United Parcel Serv.,
Inc.*, 388 F.3d 263 (7th Cir. 2004), the Seventh Circuit affirmed summary judgment for the
defendant where the word "nigger" was used once in the workplace, ten years before the suit was
filed, and was not heard by the plaintiff. *Id.* at 272. In so holding, however, *Dandy* went out of
its way to note that its "analysis would be markedly different if [the plaintiff] were able to show
that these highly offensive comments were made more than once, or able to show that the
sentiments which underlie the comments pervaded the work environment." *Ibid*.

   These two decisions, and particularly *Dandy*, tip the scales in Hallmon's favor, at least at
the summary judgment stage. *Dandy* quite plainly suggests that summary judgment would have
been inappropriate if the term "nigger" had been used "more than once." District court decisions
have come down on both sides of this issue. *Compare Williams v. Mercy Health Sys.*, __ F.
Supp. 2d __, 2012 WL 1071214, at *8 (E.D. Pa. Mar. 30, 2012) ("The alleged use of the word
'nigger' on three occasions, combined with Defendants['] other alleged discriminatory
remarks[,] is insufficient for the Court to conclude that the alleged discriminatory conduct was
not severe or pervasive as a matter of law."), *with Rivera v. Rochester Genesee Reg'l Transp.
Auth.*, 761 F. Supp. 2d 54, 57-58 (W.D.N.Y. 2011) (granting summary judgment to the
defendant on a hostile work environment claim where the plaintiff "testified that he had been
called a 'nigger approximately three times each by two different coworkers"); *Dotson v. Gulf*,
2006 WL 44071, at *13 (S.D. Tex. Jan. 9, 2006) (same where a supervisor referred to the
plaintiff as a "nigger" once in 1998 and again in 2001); *Moore v. UPS*, 2004 WL 2339792, at *7
(N.D. Tex. Oct. 15, 2004) (same where a supervisor twice called the plaintiff "nigger," though
the plaintiff did not complain to his employer's human resources department or to another
supervisor); *Oladokun v. Grafton Sch., Inc.*, 182 F. Supp. 2d 483, 493 (D. Md. 2002) (same

where the plaintiff's supervisor used the term "nigger" twice, once directed at the plaintiff and once at a co-worker). Given the Seventh Circuit's guidance in *Dandy*, the court holds that a reasonable jury could find that the two incidents where Annis called Hallmon "nigger" and other slurs, together with Hallmon's hearing the term used by white teachers on other occasions, was "severe." Because Defendants do not address the other elements of Hallmon's § 1981 hostile work environment claim, summary judgment is denied on that claim.

Hallmon also has a § 1983 hostile work environment claim. It is more difficult to prove a hostile work environment claim under § 1983 than under § 1981 and Title VII, so the fact that Hallmon's § 1981 claim survives summary judgment does not necessarily mean that her § 1983 claim survives as well. *See Huff v. Sheahan*, 493 F.3d 893, 902-03 (7th Cir. 2007). But because Defendants do not separately analyze Hallmon's § 1983 hostile work environment claim, they have forfeited any argument that summary judgment is warranted on the § 1983 claim despite the survival of the § 1981 claim.

## III. Retaliatory Termination

Finally, Hallmon alleges that she was fired in retaliation for complaining about race discrimination at the August or October 2009 substitute teacher workshop and during her January 2010 meeting with Flanagan. Hallmon appears to pursue her retaliation claim under § 1981 and § 1983. Doc. 57 at 8 ("Hallmon complained about race discrimination in her employment, which is protected by 42 U.S.C. §§ 1981 and 1983."). It is clear, however, that Hallmon is not pressing a constitutional retaliation claim under § 1983, but instead is using § 1983 as a remedial vehicle to pursue her substantive retaliation claim under § 1981. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989) ("the express cause of action for damages

created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed by § 1981 by state governmental units").

Although § 1983 allows for suits for race discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment, the Equal Protection Clause does not prohibit state actors from retaliating against persons who complain of equal protection violations—that is, it does not contain an anti-retaliation provision analogous to that of Title VII. *See Boyd v. Ill. State Police*, 384 F.3d 888, 898 (7th Cir. 2004) ("the right to be free from retaliation may be vindicated under the First Amendment or Title VII, but not the equal protection clause"); *Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir. 1989) (same). The First Amendment does restrict state actors' ability to terminate government employees because of their speech. *See Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *Boyd*, 384 F.3d at 898. But Hallmon's papers contain no indication that she seeks to pursue a First Amendment retaliation claim; she never mentions the First Amendment and she cites no First Amendment cases. The court accordingly concludes that Hallmon does not intend to pursue a First Amendment retaliation claim through § 1983; even if she does, the claim is forfeited. *See Domka*, 523 F.3d at 783; *Witte*, 434 F.3d at 1038; *Palmer*, 327 F.3d at 597-98; *Beard*, 2012 WL 2930121, at *7. Accordingly, the court will consider only whether Hallmon has presented evidence sufficient to defeat summary judgment on a § 1981 retaliation claim.

Retaliation claims under § 1981 are governed by the same standards as Title VII retaliation claims, *see Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008), so the court will cite Title VII cases along with § 1981 cases. The Seventh Circuit has described the governing law as follows:

> A plaintiff may establish unlawful retaliation using either the direct or
> indirect method of proof. Under the direct method, [the plaintiff] must
> demonstrate that (1) he engaged in a statutorily protected activity; (2) he
> suffered a materially adverse action by his employer; and (3) a causal
> connection exists between the two. Under the indirect method, the first two
> elements remain the same, but instead of proving a direct causal link, the
> plaintiff must show that he was performing his job satisfactorily and that he
> was treated less favorably than a similarly situated employee who did not
> complain of discrimination. Once a plaintiff establishes the *prima facie*
> case under the indirect method, the defendant must articulate a
> nondiscriminatory reason for its action; if he does, the burden remains with
> the plaintiff to demonstrate that the defendant's reason is pretextual.

*Stephens*, 569 F.3d at 786-87 (citations omitted). As with her race discrimination claim,

Hallmon does not say whether she seeks to proceed under the direct method, the indirect method,

or both. Because the evidence adduced by Hallmon allows her to fend off summary judgment

under the direct method, only that method will be addressed.

Causation is the sole element of Hallmon's direct method case that Defendants have

properly disputed. In their reply brief, Defendants for the first time challenged the first element,

whether Hallmon engaged in protected activity. Doc. 58 at 9 ("it is disputed as to whether the

Plaintiff's complaints about being disrespected or not receiving the same treatment as permanent

full-time teachers at the 2009 meeting constituted protected expression"). Because Defendants'

initial brief did not advance this argument, the argument is forfeited. *See Judge v. Quinn*, 612

F.3d 537, 542 (7th Cir. 2010) (regarding an "argument that the plaintiffs raised for the first time

in their reply brief," "[t]he district court was under no obligation to entertain this late

submission, nor should we"); *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("the district

court is entitled to find that an argument raised for the first time in a reply brief is forfeited");

*Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003) ("Because

Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled to find that Volvo waived the issue.").

In seeking to establish a triable case on causation, Hallmon does not rely on direct evidence, which as noted above "usually requires an admission from the decisionmaker about his discriminatory animus." *Naficy v. Ill. Dep't of Human Servs.*, 697 F.3d 504, 2012 WL 4070115, at *4 (7th Cir. Sept. 18, 2012) (internal quotation mark omitted). Instead, Hallmon seeks to present a "convincing mosaic of circumstantial evidence" that would allow a reasonable jury to infer that she had been fired in retaliation for her complaints about race discrimination. *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 570 (7th Cir. 2012). "There are three categories of circumstantial evidence under the 'convincing mosaic' approach: (1) suspicious timing, ambiguous statements and other bits and pieces from which an inference of retaliatory intent might be drawn; (2) evidence that similarly situated employees were treated differently; and (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Ibid*.

Hallmon presents evidence of the first and third types. As to the first, Hallmon complained of discriminatory treatment in August or October 2009 (the substitute teacher workshop) and January 2010 (her meeting with Flanagan); the decision to terminate Hallmon was made at some point between February 2010—when the incident that led to the DCFS investigation, the third and final reason Flanagan gave for Hallmon's termination, occurred—and August or September 2010, when Hallmon was told that the District had fired her. Hallmon asserts that the relatively short period between her protected activity and termination suggests that the termination was retaliatory. As to the third type of circumstantial evidence, Hallmon argues that Flanagan's ostensible reasons for firing her are suspicious and thus pretextual. The October 2009 events in the kindergarten class, which Flanagan cited in firing Hallmon, occurred

nearly a year before she was fired, and yet Hallmon was not told of the complaint at the time so that she could respond or improve her behavior going forward. The third reason given by Flanagan for firing Hallmon was the incident giving rise to the DCFS investigation; yet Flanagan postponed firing Hallmon until obtaining the results of the investigation, and then fired her anyway after learning that DCFS had cleared her. Defendants respond that the time period between Hallmon's complaints and her termination was too long to support an inference of a causal relationship, and that Flanagan's decision to fire Hallmon was based on complaints from District employees who were not themselves aware of Hallmon's complaints and so could not have had retaliatory motivations.

For purposes of summary judgment, Hallmon has the better of the argument. The time between Hallmon's second complaint about discrimination (in January 2010) and the termination decision may have been as short as one month. Although the evidence does not conclusively show when the decision to terminate Hallmon was made, a jury easily could find that it was February 2010. The student complaint that led to the DCFS investigation was made in February 2010, and Flanagan testified that the behavior resulting in the DCFS investigation was Hallmon's third and final strike. Because the only new information Flanagan learned after February—that DCFS had cleared Hallmon—tended to undercut rather than boost the case for firing her, a jury could find that the termination decision did not occur later than February. *See Lalvani v. Cook Cnty.*, 269 F.3d 785, 790 (7th Cir. 2001) ("In retaliation cases, time is often an important evidentiary ally of the plaintiff. When an adverse employment action follows close on the heels of protected expression, and the plaintiff can show that the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied.").

The timing evidence alone likely is insufficient to establish causation under the direct method. *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 389-90 (7th Cir. 2012) ("In egregious cases, suspicious timing alone might create a triable issue on causation. But it rarely does.") (citations omitted). "Under ordinary circumstances, [c]lose temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment *provided that* there is other evidence that supports the inference of a causal link." *Id*. at 390 (alteration in original) (internal quotation marks omitted). Hallmon has adduced other evidence to support the inference of a causal link between her complaints and her termination. The DCFS decision to clear Hallmon would permit a reasonable jury to conclude that Flanagan's ostensible justification for firing her—that she had accrued her third and final strike with the actions that led to the DCFS investigation—was pretextual. After all, Flanagan knew by the time of the actual termination in August or September 2010 that DCFS had cleared Hallmon of her supposed third strike. The combination of suspicious timing and an arguably pretextual justification establishes a convincing mosaic of circumstantial evidence that a reasonable jury could find demonstrates that Hallmon was fired in retaliation for protesting discrimination. The evidence thus suffices to forestall summary judgment under the direct method. *See Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) (in reversing the district court's grant of summary judgment, noting that "an employer who advances a fishy reason [for terminating an employee] takes the risk that disbelief of the reason will support an inference that it is a pretext for discrimination" and that "[t]he closer two events are, the more likely that the first caused the second. We think that an inference of causation would be reasonable here").

**Conclusion**

For the foregoing reasons, Defendants' summary judgment motion is granted as to Hallmon's race discrimination claim and denied as to her hostile work environment and retaliation claims. The surviving claims will proceed to trial.

November 20, 2012

_____
United States District Judge